UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DEMETRIA FIRMAN                          )        COMPLAINT WITH DEMAND
ANTHONY PARKER, SR.                      )        FOR JURY TRIAL
                                         )
            PLAINTIFFS,                  )
                                         )        CIVIL ACTION NO.  3:19-CV-564-DJH
v.                                       )
                                         )
STEVE CONRAD                             )
                                         )
      Serve:                             )
      Steve Conrad                       )
      Louisville Metro Police Department )
      633 W. Jefferson Street            )
      Louisville, Kentucky 40202         )
                                         )
and                                      )
                                         )
WILLIAM HIBBS                            )
                                         )
      Serve:                             )
      William Hibbs                      )
      Louisville Metro Police Department )
      Ninth Mobile Division              )
      635 Industry Road, 2nd Floor       )
      Louisville, Kentucky 40208         )
                                         )        ***ELECTRONICALLY FILED***
and                                      )
                                         )
KEVIN CRAWFORD                           )
                                         )
      Serve:                             )
      Kevin Crawford                     )
      Louisville Metro Police Department )
      Ninth Mobile Division              )
      635 Industry Road, 2nd Floor       )
      Louisville, Kentucky 40208         )
                                         )
and                                      )
                                         )
GABRIEL HELLARD                          )
                                         )
      Serve:                             )

Gabriel Hellard )
Louisville Metro Police Department )
Ninth Mobile Division )
635 Industry Road, 2nd Floor )
Louisville, Kentucky 40208 )
)
and )
)
JOSH DOERR )
)
Serve: )
Josh Doerr )
Louisville Metro Police Department )
Ninth Mobile Division )
635 Industry Road, 2nd Floor )
Louisville, Kentucky 40208 )
)
and )
)
WILLIAM KEELING, JR. )
)
Serve: )
William Keeling, Jr. )
Louisville Metro Police Department )
Ninth Mobile Division )
635 Industry Road, 2nd Floor )
Louisville, Kentucky 40208 )
)
DEFENDANTS )

Come the Plaintiffs, Demetria Firman and Anthony Parker, Sr., by and through

Counsel, and asserts the following Complaint, claims, and averments against the

Defendants Steve Conrad, William Hibbs, Kevin Crawford, Gabriel Hellard, Josh Doerr,

and William Keeling, Jr. individually and as agents and employees of Louisville Metro

Government d/b/a Louisville Metro Police Department:

## PRELIMINARY STATEMENT

1. Plaintiff, Demetria Firman, graduated from Southern High School in Jefferson

County, Kentucky.  She graduated cosmetology school in 2010.  She has no criminal

history. She has worked in a trusted position taking care of disabled men by cooking, cleaning, and doing laundry for them while providing their nursing services.  For the past five years, she has been employed with the undersigned counsel's law firm, earning several promotions in the process. On August 12, 2018 she attended church with her soon to be husband and his minor child. And because they are black, were in a nice car, and were in a designated target neighborhood of LMPD, they were pulled over for these reasons only, were boxed in by unmarked LMPD vehicles, were frisked without reasonable suspicion and, Demetria's car and purse were torn apart without consent or reasonable suspicion in a desperate attempt by the officers to find guns and drugs. They did not. Demetria was not charged, as she committed no crimes. She was only permitted to leave the scene when it became apparent to the officers that Demetria and her fiancé were personal acquaintances with a colleague of the officers.

2.      Anthony Parker, Sr. works full time and has done so consistently since 2007. He has no history of violence or felony convictions. Currently, he works for a glass maker in a local well-respected business. He is a proud father to his ten-year old son. Anthony plays the bass guitar for his church, where his father is the pastor. On August 12, 2018 he attended church with his son and Demetria. On their way home, Anthony was driving Demetria's vehicle. His son was in the back seat. While driving, he reached the intersection of 28th and Broadway, activated his turn signal and made a proper left turn. Officer body camera footage shows that Anthony indeed properly and timely activated a left turn signal before initiating his turn, but LMPD officers pulled him over anyway, even citing a failure to use a turn signal as the basis for the stop. In reality, Anthony was pulled over because he is black, was in a targeted neighborhood, and was

3

being made a victim to an LMPD custom and internal policy in which black residents were being pulled over without reasonable suspicion, being told to get out of the car, being frisked, and having their vehicles torn through in a desperate attempt to find drugs and guns. The officers, consistent with their unconstitutional directives, stopped Anthony without probable cause, boxed in the vehicle, fabricated a reason for Anthony to get out of the car, searched Anthony, searched Demetria's car and belongings in the car without her consent, and only ended the detention when Anthony indicated to the officers that he was friends with one of their colleagues. At that point, the LMPD officers proceeded to their next pretextual stop (some had already left to go to the next stop), likely to subject their next victim to unconstitutional practices.

3.      This sequence of events constituted knowingly unconstitutional conduct by Defendants Crawford, Hellard, Doerr, and Keeling (LMPD Officers), all of whom were present and participated in the stop. There were also violations of the Fourth Amendment by Defendants Conrad and Hibbs, who as police chief and head of the Ninth Mobile Division (the LMPD Officers were all assigned to this Division), instituted the policies and otherwise authorized, ratified, approved, or otherwise knowingly acquiesced in the unconstitutional conduct of the LMPD Officers.   These actions were part of LMPD's policies and customs, which were referred to by LMPD as the "People, Places and Narcotics" initiative, the "Violent Crimes" initiative and the "Traffic Stop" policy. These policies and customs, as part of their design, contained direct initiatives to target predominately poor neighborhoods and black residents by using alleged traffic violations as a pretext for stopping vehicles, searching vehicle occupants, and searching vehicles with hopes of finding drugs and guns.

## JURISDICTION AND VENUE

4.     Jurisdiction over claims arising from Defendants' violation of the 4th and 14th Amendments of the United States Constitution is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (3) and (4). Jurisdiction over the state law claims is conferred upon this Court by 28 U.S.C. § 1367.

5.     Venue is proper in this Division.

## PARTIES

6.     Plaintiffs Demetria Firman and Anthony Parker are residents of this judicial district.

7.     Defendants Kevin Crawford, Gabriel Hellard, Josh Doerr, and William Keeling, Jr. (collectively referenced herein as "the LMPD Officers") were, at all times relevant herein police officers with LMPD and at all times relevant herein acted under color of law. Each is sued in his individual capacity and official capacities (pursuant to *Monell* as claims against Louisville Metro Government).[1]

8.     Defendant Steven Conrad is, at the time of this filing, the LMPD Chief. At all times relevant herein, he acted under the color of state law. He is sued in his individual and official capacities (pursuant to *Monell*).

9.     Defendant William Hibbs was at all times relevant herein the Major overseeing LMPD's Ninth Mobile Division. At all times relevant herein, he acted under the color of state law. He is sued in his individual and official capacities (pursuant to *Monell*).

---

[1] *Monell* v. *New York City Dept. of Social Services*, 436 U.S. 658 (1978).

10.     Louisville Metro Government is being provided adequate and timely notice of this suit and an opportunity to respond.

## FACTS

11.     The action herein is for the unjustifiable, intentional, and unlawful stop of the Plaintiffs, the unlawful detainment of the Plaintiffs, the unlawful search of the Plaintiffs, and the intentional infliction of emotional distress upon them by Defendants Crawford, Hellard, Doerr, and Keeling all of whom were acting under the color of state law, under the direction of Chief Conrad and Major Hibbs, and in violation of Plaintiff's Constitutional rights under the Fourth and Fourteen Amendments of the United States Constitution.

12.     All citizens are guaranteed specific rights under the Fourth Amendment.

13.     These rights include, but are not limited to:

a.      The right to not be stopped by police officers when there is no reasonable suspicion or probable cause;

b.      The right to not be frisked by officers when there is no reasonable suspicion that the person is armed;

c.      The right to not be searched by officers when there is no reasonable suspicion or probable cause;

d.      The right to not be detained by officers when there is no reasonable suspicion or probable cause;

e.      The right, when subjected to a traffic stop, to not be subjected to an investigative detention without reasonable suspicion of criminal activity; and

f.      If an investigation detention is justified, the right to a temporary detention which lasts no longer than is necessary to effectuate the purpose of the stop.

14.     All reasonably prudent police officers, including the Defendants, are aware of these guaranteed Fourth Amendment rights and are aware that their actions, which deprive citizens of these rights, is unconstitutional.

15.     Police officers shall not engage in conduct which constitutes a deliberate indifference to these rights.

16.     Under *Terry v. Ohio*, an officer must observe unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous. If there is no reasonable suspicion, or if where nothing in the initial stages of the encounter serves to conjure a reasonable fear for his own or others' safety, the officer is not permitted conduct a search of the person.[2]

17.     In addition to constitutional guarantees, the LMPD Officers at all times relevant herein were bound by their Standard Operating Procedures, which set forth requirements, guidelines, policies, and practices regarding their conduct under delineated circumstances.

18.     These SOPs establish standards for reasonably prudent law enforcement officers working as LMPD officers.

19.     The failure of an LMPD officer to adhere to the SOP objective standards constitutes a per se breach of a ministerial obligations imposed upon the officer.

---

[2] 392 U.S. 1, 30-31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

7

20.     For traffic stops, LMPD officers are bound by the following requirements:[3]

a.      To only perform a Consent Search based on the consent of the individual whose person or property is being searched.

b.      To only accuse a suspect of a particular crime when Probable Cause for the same existed and were based upon reliable objective facts.

c.      To know that reasonable suspicion requires articulable facts that, within the totality of the circumstances, leads an officer to reasonably suspect that criminal activity has been, is being, or is about to be committed.

d.      To only perform pat downs or frisks of the outer garments of a suspect for weapons if the suspect has been legitimately stopped with reasonable suspicion of a crime and the officer has reasonable grounds to believe that the suspect is armed and dangerous to the officer or others.

e.      To only engage in Terry Stops when there is reasonable suspicion that the individual may have been engaged, is engaging, or is about to engage in criminal activity.

f.      To not detain a suspect for longer than what is reasonably necessary to make reasonable inquiries and either confirm or refute his/her suspicions of criminal activity.

g.      To consider the following prior to making a pat down:

i.The type of crime suspected;

ii.Prior knowledge of the suspect's use of force and/or propensity to carry deadly weapons;

---

[3] LMPD SOP 3.6

iii.The demeanor of the suspect; and

iv.Visual indications that suggest that the suspect is carrying a firearm or other weapon.

h.      To only conduct a warrantless search of a vehicle based upon probable cause or consent.

i.      To observe and follow the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan.[4]

j.      To make a reasonable effort to provide an explanation as to why the citizen was stopped, unless doing so would undermine an investigation or jeopardize the officer's safety.

k.      To never detain a suspect for longer than what is reasonably necessary to make reasonable inquiries and either confirm or refute the suspicions of criminal activity.

21.     The LMPD SOPs, at all times relevant herein, required officers to refrain from Biased Law Enforcement Practices.

22.     The LMPD SOPs confirm the stated position of LMPD that biased policing is confirmed to impair investigative effectiveness, alienate citizens, foster a distrust of law enforcement. The SOPs also identify that biased policing is unethical and may subject officers to civil or criminal liability.

23.     The LMPD SOP prohibitions against biased policing include refraining from initiating a traffic stop, surveillance, detention, or other law enforcement activity based solely upon race or gender.[5]

---

[4] LMPD SOP 7.12.7
[5] LMPD SOP 8.8

24.     LMPD SOPs confirm that supervisors are required to familiarize their personnel with the policy on biased policing, support its provisions, observe officer behavior to identify and prevent biased law enforcement practices, and immediately report any biased law enforcement practice, in writing, through the appropriate chain of command, to the Chief of Police.

### *LMPD's Unconstitutional Traffic Stop*
### *Policies, Patterns, Practices and Initiatives*

25.     In 2017, LMPD implemented a "People, Places and Narcotics" initiative, custom and internal policy.

26.     While this initiative was not memorialized in the LMPD SOPs, Defendant Conrad himself has confirmed its existence.

27.     This initiative, while inconsistent with official policy, was the practiced custom of the Ninth Mobile Division under directives from Defendants Conrad and Hibbs.

28.     The LMPD Officers were subordinates of Defendants Conrad and Hibbs.

29.     Defendants Conrad and Hibbs were both responsible for these policies, practices and customs which, as further identified herein, led to constitutional violations of their subordinates.

30.     Defendants Conrad and Hibbs explicitly and implicitly authorized, approved and/or knowingly acquiesced in the subject unconstitutional conduct of the LMPD Officers.

31.     The LMPD Officers, despite spending the majority of their time in the Ninth Mobile engaging in traffic stops for minor violations (or no violations at all), were advised by their commanding officers and Chief Conrad that they were a Violent Crimes Unit promulgated with the tasks of taking violent crime off the street.

32.     The "People, Places and Narcotics" included explicit and implicit directives to Ninth Mobile officers, including the LMPD Officers, to engage in the following actions in order to fight violent crime:

a.      To target specific neighborhoods. Notably, the majority of these neighborhoods have a high concentration of the city's black residents.

b.      To use traffic stops as a tool for identifying violent crimes.

c.      To identify certain characteristics, such as age, sex, race and vehicle types as a basis for following vehicles and initiating stops.

d.      To conduct a traffic stop for any observed violation, or to at least cite a reason for the stop which would substantiate a stop.

e.      To use deceptive practices, such as telling the drivers that they appear "nervous", as a pretext for getting the vehicle occupants to exit the vehicle.

f.      To make traffic stops in a process which intimidate and trick the vehicle occupants in manners likely to obtain their consent for searches and detentions. These methods included conducting stops with several officers and unmarked vehicles, boxing in the suspect's vehicles, surrounding the vehicle with several officers, accusing the vehicle occupants of appearing to have something to hide, using quick double-negatives to trick occupants into consenting to searches ("you've got nothing to hide and don't care if I search the vehicle, right?" If the suspect says "yes" or "no", the officer will cite consent based upon the way the question was asked) and suggesting

that consenting to searches and detentions will be the only way to satisfy the officers' demands without ending up in jail.

g.      To force vehicle occupants to exit the vehicle on every stop without regard for probable cause or reasonable suspicion.

h.      To perform frisks on every stop without regard for reasonable suspicion.

i.      To place vehicle occupants in handcuffs in most situations and cite a fabricated fear for safety or fleeing as the basis for the same.

j.      To seek searches of vehicles on every stop without regard for reasonable suspicion or probably cause.

k.      To search vehicles inside and out, as well as belongings inside the vehicle, and to consider calling in a drug dog without regard for reasonable suspicion or probable cause.

l.      To rely upon consent from one vehicle occupant as a basis to search the belongings of all the vehicle's occupants.

33.     These traffic stops routinely violated the constitutional rights of citizens, who were misled to believe that they were obligated to exit their vehicles, undergo full-body pat-downs and have officers comb through every crevice of their vehicles, all while the officers had no reasonable suspicion of criminal activity on the part of the citizen.

34.     The outcome of this initiative was that black drivers in Louisville were at least three times more likely to be pulled over by LMPD than white drivers.

35.     In 2019, Conrad further confirmed this initiative, stating that certain people (including black males) and places (including low income black neighborhoods) were

"targeted" and that black males in low income black neighborhoods were much more likely to be pulled over, searched, and interrogated.

### The Unconstitutional August 12, 2018 Traffic Stop, Search, Seizure and Detention of the Plaintiffs

36.     On August 12, 2018 Demetria, Anthony and Anthony's son attended church.

37.      Anthony was driving Demetria's vehicle.

38.     Anthony properly activated the left turn signal and waited at the light to turn left from 28th Street to Broadway.

39.     Anthony made his turn properly.

40.     Meanwhile, Ninth Mobile officers were congregating behind him.

41.     Anthony remained calm, had his signal on, drove within the speed limit and kept a safe distance behind the other turning vehicle as he proceeded onto westbound Broadway.

42.     Despite Anthony's compliance with traffic laws, the LMPD Officers initiated a traffic stop. Specifically, as soon as Anthony completed the turn onto Broadway, Defendant Crawford activated his lights to pull the car over.

43.     Demetria, as the vehicle owner, had current and valid registration and insurance.

44.     Anthony was pulled over because of his race, location, age and the vehicle he was driving.

45.     Anthony fit the profile of those being targeted by the LMPD Officers, pursuant to LMPD customs and policies which were instituted and/or enforced by Defendants Conrad and Hibbs.

46.     The LMPD Officers, when initiating the stop on Anthony, had no probable cause and no reasonable suspicion.

47.     Despite this, at least three LMPD unmarked vehicles engaged in the stop. Two vehicles pulled behind Anthony and then, after he had come to a complete stop in a timely fashion, an unmarked LMPD Ford Pickup truck pulled in front of him to box him in.

48.     Notably, after remaining at the scene for short time, the LMPD Ford truck then departed the scene quickly to go do the same tactics on another Ninth Mobile stop in the neighborhood.

49.     Officers approached Demetria and Anthony at their separate windows.

50.     Four officers surround the vehicle.

51.     Anthony and Demetria were in their church clothes, had their hands visible, were calm and were cooperative and courteous.

52.      Defendant Crawford indicated to Anthony that he was pulled over for failure to use a turn signal turn signal.

53.     Officer body camera clearly and unequivocally refutes this; Anthony had activated his turn signal and it was functioning.

54.     Regardless, an "improper" turn signal was not an offense which would prompt a reasonably prudent law enforcement officer to fear for his safety or suspect guns or drugs.

55.     Anthony knew better than to challenge the officer's turn signal contention. Instead, he calmly demonstrated that the signal was working while apologizing for its apparent malfunction/failure to properly work at the intersection.

56.     Anthony clearly advised Crawford that the vehicle was owned by Demetria.

57.     Anthony continued to comply with the officers' requests.  He answered all of Defendant Crawford's questions cordially.

58.     Defendant Crawford asks Anthony twice whether there are any drugs or weapons in the car. Both times, Anthony says there is not.

59.     Despite his calm and friendly demeanor, Crawford accuses Anthony of shaking, even stating that Anthony's face is shaking.

60.     Anthony was not shaking or threatening in any manner.

61.     Determined to continue this illegal search by any means, Defendant Crawford commands Anthony to put his hands on the steering wheel. Crawford then reaches into the vehicle and opens the door with the inside door handle.

62.     Crawford removes Anthony's cell phone from his lap, places it on the dashboard, and proceeds to remove him from his vehicle without any explanation, probable cause, or reasonable suspicion that he was engaged in or about to be engaged in any criminal activity or that he posed a threat to the officers.

63.     On the other side of the vehicle, Doerr demands for Demetria to exit the vehicle.

64.     Doerr proceeds to frisk Demetria, who is in her church dress, without her consent and without any reasonable suspicion that she is in possession of a firearm.

65.     Concerned about the stop, frisk and continued detainment, Demetria asks Defendant Doerr, "Is something wrong?"

66.     Defendant Doerr responds, "This is how we get conduct all our stops.  It's a type of unit that works a little bit different than a traditional one."

67.     Meanwhile, Defendant Crawford asks if there is anything in Anthony's "pockets that will get him in trouble." Anthony confirms there is not.

68.     Crawford still proceeds to go through Anthony's pockets and frisk him. The intention is clearly to try and locate drugs, rather than feeling for weapons.

69.     Crawford had no reasonable suspicion of a weapon being on Anthony's person when he frisked him.

70.     Defendant Crawford then removes the child from the vehicle on the side of traffic as cars continue to pass.

71.      Despite the vehicle being owned by Demetria and Demetria's purse being in the vehicle, the LMPD Officers begin to swarm through the vehicle and the purse, thoroughly searching them both without Demetria's consent.

72.     Defendant Crawford's search starts at the floor board.  He goes through the center console, he looks in a wallet in the side of the door, he goes through trash and cushions. He finds nothing.

73.     On the opposite side of the car, Defendant Keeling turns goes through Demetria's purse. He gets excited over prescription bottles, only to learn that they were prescribed to Demetria due to surgery.  When responding to Defendant Crawford's request for what he has found on the passenger side, he responds, "nothing too good" the officers laugh.

74.     When it becomes apparent to Keeling that he is striking out, he leaves the scene to join another Ninth Mobile team on a different traffic stop. Prior to leaving, he advises Doerr to further search the vehicle.

75.    The officers' desperate efforts continue; they attempt to move the casing on the gear shift, look above the visor, on the door panel, in the back seat and around the back mat.  They look through a plastic bag with a box of chicken and fries and check all sides inside the container with a bare hand and flashlight.

76.    Defendant Crawford opens the trunk from inside the vehicle.  He approaches the open trunk with his flashlight, looks under gas cans, opens the guitar bag and continues to strike out on his quest for drugs or guns.

77.    Doerr's search starts on the passenger side.  He opens other zippered areas of Demetria's purse without her consent.  He also goes through the bag of chicken, empties boxes, and goes through back-seat floor board.  He finds nothing.

78.    Demetria never gave consent to this search at all, let alone the searches of the purse and the trunk.

79.    Defendants Crawford and Doerr continue to detain the family outside of the vehicle on the side of the road for several minutes.

80.    During this time, Demetria and Anthony were never advised that they were free to leave.

81.    The search of the Demetria's vehicle constituted an examination of private property in which Demetria and Anthony had a reasonable expectation of privacy.

82.    The purpose of the search of the vehicle was to discover contraband, weapons, or other evidence of guilt in a crime to be used in a criminal prosecution.

83.    The search included and involved prying into, or manipulating of, concealed or hidden places in order to discover something criminal in nature.

84.     The entire time Demetria, Anthony and his child were held behind the car, they remained in the custody of the police.

85.     The LMPD Officers lacked grounds for detaining the citizens and they lacked a constitutionally permissible reason for searching the vehicle.

86.     Pursuant to LMPD SOP 1.11.7, the Ninth Mobile Division:

*(A)ddresses violent crime in Louisville Metro by focusing on hot spots of violent criminal activity, identifying and arresting the worst offenders, and addressing gang activity that the Ninth Mobile Division encounters. The Ninth Mobile Division is also responsible for identifying and apprehending fugitives who are known violent offenders.*

87.     None of the LMPD Officers articulated any reason as to why they believed that stopping and searching the family and the vehicle would reduce violent crime, nor did they attempt to articulate any reasonable suspicions which prompted them to conduct frisks, searches and detain the family.

88.     None of the LMPD Officers articulated any basis for their apparent determination that Demetria, Anthony and his then nine-year old son had committed, were committing and were about to commit a violent crime.

89.     No drugs, weapons, or evidence of any crime were discovered during the search of the family and the vehicle.

90.     The Defendants knew or otherwise should have known that this pattern and practice of aggressively and illegally targeting black motorists, pulling them over in a pack-like mentality, surrounding the vehicles, subjecting the vehicle occupants to unlawful and humiliating frisks, engaging in unlawful and intrusive searches of the vehicles and performing the conduct with a bullying and biased demeanor is a consistent deprivation of constitutional rights. Despite this, the custom is for the officers and their superiors to

justify these aggressive stops by citing minor traffic violations or leaving the motorist thinking he's committed a minor traffic violation without being cited.

91.   The Ninth Mobile Division superiors encourage, ratify and train the LMPD Officers to engage in this practice of illegal stops, frisks, detentions and searches.

92.   Because of the practices promoted by Defendants Conrad and Hibbs, a family leaving church without doing any wrong was left scarred for life and wondering what else they should have done differently.

93.   The Defendants' conduct demonstrated a deliberate indifference for legality, repercussions or long-term effects on these citizens.

94.   All the LMPD Officers' unlawful conduct herein was pursuant to training, direction, and ratification of Hibbs and Conrad which each knew amounted to a malicious and deliberate indifference to the rights of citizens, including Plaintiffs.

95.   Defendants Hibbs and Conrad knew or should have known that the orders to use "aggressive policing" through "traffic stops" for minor violations in black neighborhoods as a mechanism to reduce violent crime would result in biased policing and unconstitutional stops, searches, seizures and detainments of citizens, the majority of whom are black males and persons living in lower income if not poverty-stricken neighborhoods.

96.   The use of trigger words, such as "high crime," "violent crime," "guns" and "narcotics" shall not diminish the constitutional rights of individuals when police are active in an area.

97.   Citing a failure to use a turn signal as the basis for a traffic stop, despite body camera video clearly confirming an activated turn signal, confirms a flagrant

indifference for constitutional and federally protected rights of individuals subjected to this customary conduct.

98.     The Defendants' individual and collective actions were deliberate deprivations of the Plaintiffs' rights guaranteed by the U.S. Constitution under the Fourth Amendment and Fourteenth Amendment, as well as those afforded under all other applicable state and federal laws, including but not limited to those within 42 U.S.C. § 1983.[6]

99.     The Defendant LMPD Officers, in their actions and at the direction of Defendants, Conrad and Hibbs, each failed in their black-letter ministerial duties under the LMPD Standard Operating Procedures.

100.    To the extent any of the duties were discretionary, the violations to Plaintiffs involved clearly established constitutional rights of which a reasonable officer would have known.

101.    As the Defendants' conduct was in part due to the practices, policies and customs of LMPD/Louisville Metro Government, the Officers have been properly sued individually and in their official capacities under 42 U.S.C. § 1983 as the city itself is responsible for subject constitutional violations.

102.    *The municipality's* policies subjected or caused the Plaintiffs to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution under 42 U. S. C. § 1983.

---

[6].Municipal corporations, who may be sued via officers in their official capacities, are persons who may be sued under 42 U. S. C. § 1983 "when execution of an official government policy or custom inflicted the constitutional violation." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 660, 98 S. Ct. 2018, 2020 (1978).

103.    The LMPD Officers' conduct was objectively unreasonable considering Plaintiff's clearly established constitutional rights.

104.    The decisions of Defendants, Conrad and Hibbs, to promote the conduct performed by the LMPD Officers as alleged herein were outrageous, reckless and with blatant disregard for the rights of the public, including the Plaintiffs.

105.    The actions of the Defendants herein were of a nature which shocks the conscience.

106.    None of the LMPD Officers had an objectively reasonable basis to believe that Plaintiffs had recently committed, were engaged in, or were about to commit a criminal offense. These officers, acting under state law, deprived Demetria and Anthony of their constitutional rights and are thus subject to liability under 42 U.S.C. § 1983.

107.    In analyzing the specific language in § 1983, the language plainly imposes liability on a governmental entity that, under the color its policies or customers, causes an employee to violate another's constitutional rights.[7]

108.    The conduct of the Defendants was intentional, was in gross violation of known constitutional standards for stops, searches, seizures and detainments, and their unlawful actions in this regard rendered it inevitable that Plaintiffs' constitutional rights would be violated.[8]

109.    That the Defendants' conduct caused Demetria and Anthony to suffer emotional distress.

---

[7] *Deaton v. Montgomery Cty.,* 989 F.2d 885, 889 (6th Cir. 1993).
[8] When the "execution of the government's policy or custom . . . inflicts the jury," official capacity claims shall survive under § 1983.'" *City of Canton v. Harris*, 489 U.S. 378, 385, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989).

## COUNT 1: UNLAWFUL STOP, DETENTION, SEARCH & SEIZURE IN VIOLATION OF FOURTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY 42 U.S.C. § 1983

### (LMPD OFFICERS)

110.    The Fourth Amendment of the United States Constitution guarantees the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.

111.    The LMPD Officers' stopping of the automobile and detaining the Plaintiffs constitutes a "seizure" within the meaning of the Fourth and Fourteenth Amendments of the United States Constitution.

112.    The LMPD Officers' ensuing search of Plaintiffs and Demetria's vehicle were "searches" within the meaning of the Fourth and Fourteenth Amendments of the United States Constitution.

113.    The traffic stop and subsequent detention was without probable cause, without reasonable suspicion, without a warrant, and without other exigent circumstances.

114.    The searches and seizures were without probable cause, without reasonable suspicion, without a warrant, and without other exigent circumstances.

115.    The frisk was without probable cause or reasonable suspicion of a weapon.

116.    The searches and seizures were objectively unreasonable.

117.    The searches and seizures were without consent.

118.    The frisk, searches, and seizures were in violation of LMPD SOPs and the ministerial duties imposed upon the LMPD Officers by these SOPs.

119.    The physical and psychological intrusions upon Plaintiffs by the LMPD Officers were substantial. The stop, frisk, searches, and seizures produced an unsettling

show of authority, an interference with freedom of movement, inconvenience, consumption of time, creation of substantial anxiety, and the show of intimidation, harassment, and bullying.

**COUNT 2: UNLAWFUL TERRY STOP AND DETAINMENT IN VIOLATION OF FOURTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY 42 U.S.C. § 1983**

**(LMPD OFFICERS)**

120.   Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and incorporates the same by reference.

121.   The LMPD Officers performed an unlawful Terry stop on the Plaintiffs in violation of their Fourth Amendment rights.

122.   The totality of the circumstances did not provide the LMPD Officers with the reasonable suspicion required in order to detain the Plaintiffs under *Terry*.

123.   The conduct of the LMPD Officers in detaining the Plaintiffs was unreasonable.

124.   The physical and psychological intrusions upon the Plaintiffs by the LMPD Officers' Terry stop and subsequent conduct were substantial.

125.   The stop, searches and seizures entailed an unsettling show of authority, interference with freedom of movement, inconvenience, consumption of time, creation of substantial anxiety and the show of intimidation, harassment, and bullying.

**COUNT 3: *MONELL* CLAIMS PURSUANT TO 42 U.S.C. § 1983**

**(OFFICIAL CAPACITY CLAIMS – DEFENDANTS AS AGENTS OF LOUISVILLE METRO GOVERNMENT)**

126.    Plaintiffs adopt and reiterate each and every allegation as if set forth fully herein and incorporates the same by reference.

127.   The Defendants, in their official capacities, are all "persons" subject to liability under 42 USCS § 1983, and thus are not immune from being sued for implementing and acting in accordance with customs and policies which deliberately promote constitutional violations.

128.   The Defendants indeed implemented and/or acted in accordance with customs and policies which deliberately promoted constitutional violations.

129.   The Plaintiffs were both subjected to constitutional violations as a result of these customs and policies in violation of 42 USCS § 1983.

### COUNT 4: NEGLIGENT TRAINING & SUPERVISION
### (CONRAD & HIBBS)

130.   Plaintiffs adopt and reiterate each and every allegation as if set forth herein and incorporates the same by reference.

131.   The LMPD Officers actions were the result of Defendant Conrad and Defendant Hibbs authorization, approval and knowingly acquiescence of the unconstitutional conduct of the LMPD Officers.

132.    Conrad and Hibbs instigated or otherwise caused the unlawful stop, search and seizure of the Plaintiffs.

133.   Conrad and Hibbs did not properly train the LMPD officers; while the SOPs identified certain prerequisites for stops, searches and seizures, Conrad and Hibbs were in fact promulgating or otherwise ratifying the custom of Ninth Mobile Officers to engage in conduct well outside the scope of that which was permitted by policy. This known LMPD custom was counter to official policy, Conrad and Hibbs were in charge of enforcing that custom and that custom led to the constitutional violations committed upon the Plaintiffs.

134.    That Defendants Conrad and Hibbs knew, or in the exercise of reasonable diligence should have known, that by failing to properly train and/or supervise LMPD officers and employing the "people, places, narcotics" initiative would result in unconstitutional consequences to citizens.

135.    That the training and/or supervision by Conrad and Hibbs was grossly inadequate, malicious, reckless, intentional, unjustified, unreasonable, and/or grossly negligent.

136.    That the failure by Defendants Conrad and Hibbs to train the Defendant LMPD Officers as to the constitutional limitation of search and seizure and use of force amounted to a deliberate indifference to constitutional rights of the citizens of Louisville, including the Plaintiffs.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following:

1.    That Summons and Complaint to be issued against the Defendants;

2.    That the Plaintiffs obtain individual judgments against the Defendants for compensatory damages in an amount the jury believes to be just, fair and equitable, given the facts and after hearing the issues in this case;

3.    Punitive damages against Defendants in an amount to be shown at trial;

4.    Attorney fees;

5.    The costs of pursing this action;

6.    Post-judgment interest and all interest found to be due to the Plaintiffs; and

7.    All relief to which they are entitled or which the Court finds to be equitable

and just, including but not limited to the right to amend this action.


Respectfully submitted,

*/s/ Sam Aguiar*_____
Sam Aguiar
Sam Aguiar Injury Lawyers, PLLC
1201 Story Avenue, Suite 301
Louisville, KY 40206
Telephone: (502) 400-6969
Facsimile: (502) 491-3946
sam@kylawoffice.com
*Counsel Demetria Firman*


*/s/ Josephine Buckner*_____ __
Josephine Buckner
Lonita Baker
Sam Aguiar Injury Lawyers, PLLC
1201 Story Avenue, Suite 301
Louisville, KY 40206
Telephone: (502) 400-6969
Facsimile: (502) 491-3946
lonita@kylawoffice.com
jbuckner@kylawoffice.com
*Counsel for Anthony Parker, Sr.*